

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 1, 2024

**BY ECF & EMAIL**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Ece Alptunaer*, 23 Cr. 188 (AT)

Dear Judge Torres:

      Ece Alptunaer is scheduled to be sentenced on April 9, 2024, after pleading guilty to wire fraud. With phony invoices and by abusing her access to company bank accounts, Alptunaer stole more than half a million dollars from the small business that trusted her as its bookkeeper. For the reasons explained below, the Government respectfully submits that a sentence at the top end of the stipulated Guidelines range of 21 to 27 months' imprisonment is warranted in this case. The recommended sentence is sufficient, but not greater than necessary, to account for the factors set forth in Title 18, United States Code, Section 3553(a).

      **I.**    **Offense Conduct**

      Around November 2021, a small business based in Manhattan ("Company-1") hired Alptunaer to work as its part-time bookkeeper. (PSR ¶ 10). Alptunaer's role included using Company-1's online payments processing service ("Payment Processor-1") to receive and pay invoices from certain of Company-1's vendors. (*Id.* ¶ 11). Payment Processor-1's service permits businesses to link their bank accounts to Payment Processor-1's website, and to cause funds transfers to be made from their bank accounts to the bank accounts of vendors or other counterparties. *See id.* Company-1 provided Alptunaer with login credentials to access Company-1's account on Payment Processor-1's website. *See id.*

      In or around January 2023, Company-1's owner began to receive inquiries from vendors about unpaid invoices. Company-1's review of its files, and its communications with its banks, caused it to suspect that funds had been misappropriated. Payment Processor-1's records revealed that, in or around February 2021—roughly three months after starting to work as Company-1's bookkeeper—Alptunaer created her own account at Payment Processor-1's website to which she had linked certain of her personal accounts. (PSR ¶ 12). Alptunaer—a Company-1 wage employee, not a contractor who billed for her time—used her Payment Processor-1 personal account to create invoices purporting to bill Company-1 for unspecified and nonexistent services. (*Id.* ¶¶ 13-15). Alptunaer then used her access to Company-1's Payment Processor-1 account to

cause unauthorized funds transfers from Company-1's business bank accounts to Alptunaer's personal bank accounts. (*Id.*).

Alptunaer stole at least $536,852.32 from Company-1 through approximately 100 separate unauthorized transfers over the course of nearly a year. (*Id.* ¶ 17). The harm cause by this fraud to Company-1 was significant. In a victim impact statement, Company-1's owner explained that "the enormity of the amounts Ece stole threatened the credit we have with vendors . . . caus[ing] our access to the media platforms we need to conduct business to be shut off which brought the company's day-to-day operations to a halt." (PSR ¶ 19). He further stated that "[r]epaying the hundreds of thousands of dollars we owed to our vendors with my personal retirement funds was the only way I found to avoid personal bankruptcy and attempt to keep the company operating." (*Id.* ¶ 20). The fraud required Company-1 to lay off employees, and cost it a long-term client relationship. (*Id.* ¶ 20). And the company's sole owner suffered meaningful personal harm: it "wreaked havoc on [his] physical health," and he was "forced to dive deep into my retirement savings to keep the company going." (*Id.* ¶ 21).

## II.   Procedural History and Guidelines Calculations

### A.   Defendant's Plea and the Parties' Guidelines Calculation

On December 5, 2023, Alptunaer pleaded guilty, pursuant to a plea agreement, to one count of wire fraud in violation of 18 U.S.C. § 1343.

In the plea agreement, the parties stipulated to a Guidelines range of 21 to 27 months' imprisonment (the "Stipulated Guidelines Range"). (*See* Plea Agmt. at 2-3). Specifically, the parties calculated the Stipulated Guidelines Range as follows: a base offense level of seven for the wire-fraud count of conviction, pursuant to U.S.S.G. § 2B1.1(a)(1); a 12-level increase for the loss amount of $536,852.32, pursuant to U.S.S.G. § 2B1.1(b)(1)(G); and a two-level enhancement because the offense conduct involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(1)(G). (*See* Plea Agmt. at 2-3). The parties further stipulated to a three-level reduction for Alptunaer's anticipated acceptance of responsibility, *see* U.S.S.G. § 3E1.1, and a two-level reduction for having zero criminal history points, *see id.* § 4C1.1(a). (*See* Plea Agmt. at 2).

### B.   Probation's Guidelines Calculation

The Probation Office calculated a different Guidelines range of 41 to 51 months' imprisonment. (PSR ¶¶ 25-37, 79). Probation's calculation differed from the parties' calculation in the following respects: (*i*) Probation applied a two-level enhancement based on the offense resulting in substantial financial hardship, (PSR ¶ 28), pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(iii); (*ii*) Probation found that the application of this enhancement for causing substantial financial hardship disqualified Alptunaer from the two-level reduction she would otherwise receive for having zero criminal history points, (PSR ¶ 80), *see* U.S.S.G. §§ 4C1.1(a) and (b), and (*iii*) Probation applied a two-level enhancement for the defendant's abuse of her position of trust as the victim company's bookkeeper, (PSR ¶ 31), pursuant to U.S.S.G. § 3B1.3. As a result, the Probation Office calculated a total offense level of 22 (and Guidelines range of 41 to 51 months'

imprisonment) against the parties' stipulated total offense level of 16 (and Stipulated Guidelines Range of 21 to 27 months' imprisonment).

Notwithstanding its calculation of a higher offense level and resulting Guidelines range of 41 to 51 months' imprisonment, the Probation Office recommends a sentence principally of 24 months' imprisonment. (PSR at pp. 30-31). The PSR justifies its recommendation for a downward variance by reference to Alptunaer's lack of criminal history, her successful adjustment to pretrial supervision, and her attainment of education and skills that the Probation Office believes will aid her community reentry. (*Id.*)

### C. Applicability of the Abuse of Trust Enhancement

The Government stands by the plea agreement and, as explained further below, recommends a sentence at the top end of the Stipulated Guidelines Range. The Government notes, however, that it concurs with the Probation Office as to the applicability of the enhancement for abuse of a position of trust.

Section 3B1.3 of the Guidelines—the enhancement for abuse of a position of trust—increases a defendant's offense level by two where she "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." This provision "refers to a position . . . characterized by professional or managerial discretion," and "[p]ersons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature." *Id.* app. note 1. The Probation Office concluded that Alptunaer's role as Company-1's "sole bookkeeper" (PSR ¶ 31 & p. 27) "contributed in some significant way to facilitating the commission or concealment of the offense," U.S.S.G. § 3B1.1 app. note 1, and the Government concurs in this analysis. It is undisputed that Alptunaer's offense conduct included using her "access to and trust to operate [] the company's account with an online third-party payment processing service" to make unauthorized funds transfers from the company's bank accounts to her own. (PSR ¶¶ 8, 13). The abuse of trust enhancement therefore appears to apply here.

### D. Insufficient Record to Apply the Substantial Financial Hardship Enhancement

Although Probation has applied the substantial financial hardship enhancement, the Government respectfully submits that the factual record does not support the application of the enhancement.

Section 2B1.1(b)(2)(A)(iii) of the Guidelines—the enhancement for causing substantial financial hardship—increases a defendant's offense level by two where her offense "resulted in substantial financial hardship to one or more victims." A "victim" is "any person who sustained any part of the actual loss determined under [Section 2B1.1(b)(1)]," including any "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies." U.S.S.G. § 2B1.1, app. note 1. To determine whether an offense resulted in substantial financial hardship, the Court engages in a fact-specific inquiry. Specifically, the Court considers "whether the offense resulted in the victim" experiencing at least six conditions of varying degrees of

determinacy and subjectivity: become insolvent; filing for bankruptcy; "suffering substantial loss of a retirement, education, or other savings or investment fund"; "making substantial changes to his or her employment, such as postponing his or her retirement plans"; "making substantial changes to his or her living arrangements, such as relocating to a less expensive home"; and "suffering substantial harm to his or her ability to obtain credit." *Id.* § 2B1.1, app. note 4(F).

The PSR justifies application of the enhancement for causing substantial financial hardship by reference to a statement submitted by Company-1's owner in January 2024, several months after the execution of the plea agreement (the "Victim Impact Statement"). (*See* PSR ¶¶ 18-21 and p. 30). In relevant part, the Victim Impact Statement indicates that the fraud "threatened the credit we have with vendors . . . caus[ing] our access to the media platforms we need to conduct business to be shut off which brought the company's day-to-day operations to a halt" (PSR ¶ 19); that "[r]epaying the hundreds of thousands of dollars we owed to our vendors with my personal retirement funds was the only way I found to avoid personal bankruptcy and attempt to keep the company operating" (*id.* ¶ 20); that the fraud required Company-1 to lay off employees and cost it a long-term client relationship (*id.* ¶ 20); and that the company's sole owner was "forced to dive deep into [their] retirement savings to keep the company going" (*id.* ¶ 21).

The harms described in the Victim Impact Statement can and should be taken into consideration by the Court at sentencing. They constitute aggravating factors in the Section 3553(a) analysis that underscore the Government's recommendation for a sentence at the top of the Stipulated Guidelines Range. Beyond that, however, absent further fact finding, the Government submits that there is an insufficient factual record to apply the substantial financial hardship enhancement. The Government has not fully investigated the scope of the financial harm caused by the fraud; while the Government credits the statements by the Victim, given the fact-specific nature of the inquiry under U.S.S.G. § 4B1.1, and the relevant application note (4(F)), it would be inappropriate to apply the enhancement on this record. *See, e.g.*, *United States v. Davis*, No. 15 Cr. 247 (PJS/SER), 2017 WL 1423178, at *2-3 (D. Minn. Apr. 21, 2017) (declining to apply enhancement in face of conflicting evidence whether fraud losses proximately caused business to go into receivership). In view of these understandings and considerations, and the apparent absence of Second Circuit case law applying the enhancement in analogous circumstances, the Government submits that the Court should not apply the enhancement here. Further, given that an appropriate sentence can be found at the top end of the Stipulated Guidelines Range, no further fact-finding is warranted on this issue. Finally, even if the Court determines that the enhancement does apply, the Government submits, for the reasons below, that a sentence at the top of the Stipulated Guidelines Range is nonetheless fair and appropriate.

### III.  Discussion

#### A.  Applicable Law

The Sentencing Guidelines continue to provide a critical touchstone following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, while the Guidelines are no longer mandatory, sentencing courts must consult them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the

applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant;

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Although the Court may not presume the reasonableness of a sentence within the Guidelines range, the Second Circuit has recognized that "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006); *see also Kimbrough v. United States*, 552 U.S. 85, 108-09 (2007) ("We have accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." (quotations omitted)).

### B. A Sentence at the Top of the Stipulated Guidelines Range is Warranted

Consideration of the Section 3553(a) factors counsels in favor of a sentence principally of 27 months' imprisonment—the top of the Stipulated Guidelines Range. Such a sentence would reflect the seriousness of the offense, promote respect for the law, afford adequate specific and general deterrence, and protect the public from the prospect of future frauds by Alptunaer. Sentencing Alptunaer to the top end of her Stipulated Guidelines Range would also reflect the aggravating features of her fraud—its calculation, repetition, duration, and extent—while contemplating her release in the near-enough future to account for "the need to provide restitution." 18 U.S.C. § 3553(a)(7). This sentence would also fully reflect consideration of the sentencing factors that counsel more favorably for the defendant, such as her history and characteristics as a

first-time offender who has lived an apparently otherwise law-abiding life, and her motive for committing the fraud, which appears to have been her desire to help her family, as opposed to greed [more color to add here?].

First, a sentence within the Guidelines range would appropriately balance the nature and circumstances of the offense and Alptunaer's history and characteristics. As to the nature and circumstances of the offense, Alptunaer engaged in a calculated scheme to steal money from a business and its owner who entrusted her with its finances. Given the volume of fraudulent transactions and the period of the scheme, Alptunaer made near-daily decisions to continue her theft for nearly a year. Indeed, Alptunaer claims a mitigating absence of mind—"I never thought that by trying to fix things for my family I was damaging other lives," (*id.* at 2-3)—but reveals an aggravating presence of mind underscoring her deliberation and calculation: "When I started doing this, I felt confident that I could explain it to the owner, and I could get couple more jobs and paying him via installment payment from my paycheck and I could make up for what I did," (*id.* at 3). What is more, her theft involved not just a simple taking of funds, but deception to conceal her fraudulent transfers—by creating and submitting false invoices (*see* PSR ¶¶ 14-15)—and further international transfers to convert the funds to her benefit and cause them to be practically impossible for United States law enforcement to recover for the victims. The damage that this caused a small business and its sole owner is laid out in a letter "included in its entirety" in the PSR "[d]ue to the poignancy of the sentiments it conveyed," (PSR ¶ 18), ranging from layoffs of honest, innocent employees to physical and mental health consequences for the person who hired Alptunaer and entrusted her with sensitive information and assignments only to be victimized by her in return.

Alptunaer's history and characteristics provide both aggravating and mitigating considerations. While her lack of criminal history is certainly favorable, the Stipulated Guidelines Range already reflects this circumstance and awards Alptunaer credit for it twice: first by reducing her total offense level by two, (PSR ¶ 5(g)), U.S.S.G. § 4C1.1(a), and again by providing the lowest sentencing range for that offense level through her placement in Criminal History Category I, (PSR ¶ 5(i), (j)). Other features of Alptunaer's history and characteristics cut against leniency. Her submission highlights Alptunaer's generally laudable traits and the myriad of advantages she was born with and earned for herself. But these only aggravate her responsibility for choosing theft and deception over lawful application of her privileges and skills. She is fully able to legitimately earn an adequate income, (*see* Def. Sub. at 2 ("Ms. Alptunaer has a strong work ethic" and a "long history of gainful employment"), has a strong personal support network for aid in hard times, (*see id.* at 1-2 (describing close relationship with family and current support from friends and family), and has academic training and credentials far beyond the average person, much less the average criminal defendant (*see id.* at 2). These facts may well predict success on her supervised release (*see id.* at 1), but they underscore the culpability of a defendant who put good skills to bad use, chose to rely on crime over leaning on social supports, and stole from those who trusted and fairly compensated her.

A sentence at the top of Alptunaer's Stipulated Guidelines Range would also fairly account for the series of "just punishment" factors at Section 3553(a)(2). The defense submission repeats familiar criticisms of the fraud guidelines' accounting for the losses attributable to an offense. (*See* Def. Sub. at 3-5). But the objection that loss amount is a poor proxy for culpability has hardly any

force where, as here, that figure is the sole function of a single defendant acting alone to commit a fraud and reap all of its rewards.  The defense submission's cited authorities only underscore the gap between Alptunaer's offense conduct and cases where a loss-driven Guidelines range was found to be insufficiently tethered to the foreseeable consequences of a defendant's own conduct.  For example, in *United States v. Algahaim*, 842 F.3d 796, 798 (2d Cir. 2016), two defendants were convicted of unlawfully purchasing food-stamp benefits for cash.  The loss amount aggregated the value of the multidefendant scheme (which included an uncharged beneficiary—the business that profited from the unlawful sale of food benefits for cash) and held each individual defendant, including a deli employee, accountable for that total figure.  *See id.* at 799-800.  Nor is Alptunaer's relationship to her loss amount like the one in *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), which noted the peculiarity of holding an individual securities fraud defendant accountable for stock-price movements that may measure in the hundreds of millions or billions of dollars.  *See id.* at 509 (noting that this particular fraud "generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart").  *United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), similarly misses the mark: unlike one defendant in that multi-defendant fraud conspiracy, Alptunaer cannot object that "two-thirds of the total" of her offense level "are exclusively the product of [a co-defendant's] monetary gain, in which [Alptunaer] did not share in any direct sense."  *Id.* at 351.  The defense submission's final effort to align Alptunaer with cases where loss amounts diverged from culpability fails, too.  (*Compare* Def. Sub. at 5 (citing *United States v. Ovid*, No. 09 Cr. 216 (JG), 2010 WL 3940724, at *1 (E.D.N.Y. Oct. 1, 2010) (describing general criticisms of U.S.S.G. § 2B1.1)) *with Ovid*, 2010 WL 3940724, at *5-6 (finding that loss amount is poor measure of culpability where fraud began as legitimate charitable venture and "the defendant and his co-conspirators all believed that this was actually going to work" and worked initially "to benefit all of the people in the church")).  But Alptunaer was entirely responsible for creating the loss amount in this case and captured all of its value.  Its contribution to her Stipulated Guidelines Range is rational and just.

So, too, would a sentence at the top of the Stipulated Guidelines Range adequately counter the risk of recidivism and protect the public against any temptation Alptunaer might have in the future to "try[] to fix things for her family" and herself by stealing from others (*see* Def. Sub. at 2-3).  While Alptunaer deserves and has received credit for accepting responsibility after she was caught, her own descriptions of her conduct and remorse underline the need to ensure adequate deterrence.  She identifies as her motives facts evincing common misfortunes rather than extraordinary desperation, and a global pandemic that caused similar struggles for billions of people around the world.  (*See id.* at 2 (quoting Alptunaer letter citing needs to support parents, pay bills, and satisfy debt collectors); *id.* (explaining that "the high death toll of the pandemic," and the attendant anxiety that caused Alptunaer to feel for her parents, contributed to her decision to engage in a near-daily fraud scheme for almost a year).  While her submission asks the Court to trust Alptunaer to have learned simply from being caught, a sentence to a term of imprisonment would better assure an appropriate understanding of the consequences that attend taking advantage of a trusted counterparty by stealing its money.

## IV.     Conclusion

For the reasons explained above, the Government respectfully submits that the Court should impose a sentence principally of 27 months' imprisonment—the top of the Stipulated

Guidelines Range of 21 to 27 months.  The Government also adopts the Probation Office's recommendation that the Court impose a two-year term of supervised release with certain special conditions tailored to Alptunaer's conduct.  (*See* PSR at p. 30-31).

          Respectfully submitted,

          DAMIAN WILLIAMS
          United States Attorney

By:    /s/
       Justin Horton
       Assistant United States Attorney
       (212) 637-2276

cc:    Clay H. Kaminsky, Esq.